IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DUANE R. BULL,

                  Plaintiff,

  v.                                                               OPINION and ORDER

CANDACE WHITMAN,                                  17-cv-957-jdp

                  Defendant.[1]

---

Plaintiff Duane R. Bull, appearing pro se, is a prisoner at Racine Correctional Institution. Bull alleges that when he was incarcerated at Fox Lake Correctional Institution, defendant Candace Whitman refused to give him bottled water to prevent him from being harmed by contaminants in the prison's drinking water. Both Bull and Whitman have filed motions for summary judgment. I will deny Bull's motion, grant Whitman's motion, and dismiss the case because Bull fails to show either that the water caused his medical problems or that Whitman consciously disregarded his problems.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted. The parties also discuss issues related to this court's previous litigation about contaminants in the FLCI water; I have included some facts from my summary judgment decision in that case for background purposes. *See Stapleton v. Carr*, 438 F. Supp. 3d 925, 927 (W.D. Wis. 2020).

---

[1] I have amended the caption to reflect the proper spelling of Whitman's name as reflected in her submissions.

Plaintiff Duane R. Bull was an inmate at FLCI. Defendant Candace Whitman has been the health services manager at FLCI since July 2016.

Drinking water sometimes contains small amounts of contaminants. People often obtain part of their needed intake of copper from their drinking water, but exposure to elevated levels of copper can be hazardous to human health.

Lead is hazardous to human health; according to the National Institute of Environmental Health Sciences, "No blood lead level is safe."[2] The United States Environmental Protection Agency (EPA) states that it "has set the maximum contaminant level goal for lead in drinking water at zero because lead is a toxic metal that can be harmful to human health even at low exposure levels. Lead is persistent, and it can bioaccumulate in the body over time."[3] But that zero-lead goal is not enforced by law. Drinking water regulations set by the EPA establishes "action limits," also known as "maximum contaminant levels," for metals including lead, copper, and arsenic.

Several times between 2008 and 2013, water testing at FLCI showed lead and copper concentrations that exceeded the EPA's action level for lead and other metals. In May 2014, the Department of Corrections entered into a consent order with the Wisconsin Department of Natural Resources (DNR) regarding the water quality at FLCI. Specifically, FLCI agreed to provide "public education" regarding the lead and copper action level exceedances, submit plans for cleaning, flushing, monitoring, and rehabilitation of the wells in the system, and

---

[2] National Institute of Environmental Health Sciences, *Lead*, https://www.niehs.nih.gov/health/topics/agents/lead/index.cfm.

[3] United States Environmental Protection Agency, *Basic Information about Lead in Drinking Water*, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.

obtain compliance with the lead and copper standards. In June 2015, a memorandum was posted in each housing unit stating that elevated levels of lead were found in the drinking water in some of the FLCI buildings, and that people with a variety of medical conditions, including high blood pressure, would be more susceptible to injury from the contaminated water.

The DOC took various efforts to remediate the contaminant problem, and in December 2016 the DNR "closed out" the consent order. After that, the lead and copper test results fell below the action levels, but they were not zero.

Bull arrived at FLCI in May 2014. Bull had previously been diagnosed with hypertension. Bull states that while at FLCI he began having severe back pain and passing blood in his urine; medical staff sent him to a urologist who diagnosed him with kidney stones.

Bull noticed the FLCI water was often dark brown, smelled and tasted bad, and had floating particles. He states that prison staff either brought their own water to work or were provided bottled water.

Bull saw a memorandum posted by prison staff stating that elevated levels of lead and other contaminants were found in the FLCI water and that people with a variety of medical conditions including high blood pressure would be more susceptible to injury from the contaminated water. Bull could not afford to buy bottled water from the commissary and he feared that he was being harmed by the water.

In mid-August 2017, Bull submitted an inmate grievance stating that an institution memo discussed the hazard that lead and other contaminants in the FLCI water could pose to inmates, particularly those with high blood pressure. Bull stated that he believed his kidney stones were caused by the FLCI water, and he asked to be provided with contaminant-free bottled water.

The institution complaint examiner spoke with defendant Whitman, who told the examiner that Bull's medical conditions "are not all related to consuming water at FLCI." Dkt. 168-2, at 2. In particular, Whitman told the examiner that the medical records did not show that the water was a contributing factor to his high blood pressure or kidney stones, and that no provider had indicated that bottled water was clinically necessary. Whitman states (although this was not mentioned in the examiner's ruling) that in meetings with the warden's office, she had been told that the institution water was being monitored and tested by the DNR and that it was safe for human consumption. The examiner recommended dismissing Bull's grievance, the reviewing authority accepted that recommendation, and Bull's appeal was also dismissed.

Bull states that at some point after his dismissed grievance, he was diagnosed with bladder cancer, which he believes was also caused by the FLCI water.

I will discuss additional facts as they become relevant to the analysis.

## ANALYSIS

I granted Bull leave to proceed on an Eighth Amendment claim against defendant Whitman for failing to provide him with bottled water given his elevated risk of harm from the contaminated FLCI water because of his high blood pressure.

The Eighth Amendment to the United States Constitution prohibits prison officials from consciously disregarding prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-

4

threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Bull's claim fails in part because he fails to show that his underlying health problems were caused by the water at FLCI. Bull is not a medical professional, so he is "not competent to diagnose himself, and he has no right to choose his own treatment." *Lloyd v. Moats*, 721 F. App'x 490, 495 (7th Cir. 2017). In some medical care cases, it is obvious to a lay person that a plaintiff is correct in blaming a particular cause for his injuries. But here, Bull would need an expert to make the link between the contaminants and his maladies.

Pro se plaintiffs often seek recruitment of counsel when expert testimony might be necessary to prove their claims. Bull has not filed a motion for counsel on this issue, but if even he had, I would deny it. Given the dearth of willing counsel available to take pro bono cases, this court should not recruit counsel "if the plaintiff's 'chances of success are extremely slim.'" *Watts v. Kidman*, 42 F.4th 755, 766 (7th Cir. 2022) (quoting *Maclin v. Freake*, 650 F.2d 885, 887 (7th Cir. 1981). I consider it extremely unlikely that recruited counsel would be able to

find an expert drawing a connection between the FLCI water and the seemingly unrelated medical problems that Bull had. And the court has already expended resources by appointing a medical and toxicology expert, Alfred Franzblau, to review the medical records of the numerous plaintiffs proceeding with their individual medical-care cases. *See Stapleton*, Case No. 16-cv-406-jdp, Dkt. 170 (W.D. Wis. Apr. 3, 2020). Franzblau's report does not support Bull's theory. Instead, Franzblau opines that it is unlikely that Bull suffered any acute or chronic toxic effects from the metals that Franzblau considered (arsenic, copper, lead, and manganese). And in particular, he stated that "it is unlikely that any of the 14 inmates [including Bull] has experienced any chronic symptoms or other chronic toxic effects . . . from ingestion of lead in the drinking water at FLCI during the time period in question." Dkt. 169-2, at 13. He came to this conclusion in large part because "the risk of chronic toxic effects related to lead (such as high blood pressure or cancer) is generally related to cumulative (i.e., many years) or lifetime exposure to lead, and not brief episodes of over-exposure, such as those lasting for a few months, as in the situation at FLCI." *Id*. at 14.

Bull challenges Franzblau's report. Bull contends that it is not certain from the report that he was one of the inmates whose records were reviewed by Franzblau, and that regardless, Franzblau reviewed only summaries of the records, not the records themselves. Defendants have submitted a document making clear that Bull's records were included in the set of records sent to Franzblau. Dkt. 169-1. To save time, Franzblau indeed consulted summaries of each prisoner's medical records as prepared by counsel that I had recruited to represent Bull and his fellow plaintiffs in the *Stapleton* case. *See* Dkt. 169-2, at 4 ("the medical records provided are voluminous (totaling over 15,000 pages). I noted during our conversation that if I were to review all of these records it would require hundreds of hours, which would be both very

6

expensive, and infeasible for the given deadline."). I take Bull to be saying that his bladder cancer diagnosis was not included in Franzblau's report, but regardless that doesn't change the outcome of the report, in which Franzblau did not believe that brief episodes of overexposure to contaminants caused any of the prisoners' various problems, including cancer present in three other inmates.

Bull also contends that the underlying lead readings that Franzblau relied on are unreliable because staff taking the water samples failed to follow directions to sample water that had been stagnating for six hours. *See id.* at 10 ("The lead Action Level is considered to be exceeded if the concentration of the 90th percentile first draw tap sample (collected after a minimum stagnation period of 6 hours from high risk sites) exceeds 15 ug/L."). Bull says that in September 2017 he "observed maintenance flushing the water main outside of his cell window. They collected several samples before the water was clear and only then were samples collected in bottles for testing." Dkt. 160, at 3. But Bull doesn't explain how he knows that this incident was part of the formal contaminant-testing process, and evidence from the *Stapleton* case suggests that it was not. *See Stapleton*, 438 F. Supp. 3d at 937 (table showing that testing was performed in April 2017 and September 2019, not September 2017). Bull's conclusory account of staff malfeasance in conducting water testing is not enough for me to disregard Franzblau's report. Bull also says that other inmates report similar malfeasance but he does not attach those statements so I cannot consider them.

Bull also tries to counter Franzblau's report by submitting what he calls expert reports supporting his claim that his kidneys stones were caused by the water. Two are pages from articles that he says are from the Mayo Clinic but it is not obvious that this is true from the documents themselves. Dkt. 141-2 and Dkt. 141-3. Whitman objects to the documents as

7

hearsay, but even if I accepted them, they do not provide expert testimony or any other useful evidence proving Bull's claims. One document discusses kidney stones and the other discusses the danger of kidney damage from lead exposure. But they do not state that lead causes kidney stones. He also submits newspaper articles about the water problems at FLCI, but those documents merely recap facts already presented to the court. Dkt. 141-4 and Dkt. 141-5.

The bottom line here is that Bull assumes that his medical problems were caused by contaminants in the FLCI water. But his mere speculation that the water caused his injuries is not enough to create a disputed issue of material fact on that issue. *See, e.g., Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)). Because Bull fails to show that his underlying health problems were caused by the FLCI water, he cannot show that he was harmed by Whitman's refusal to give him bottled water.

Bull also fails to show that Whitman consciously disregarded his medical problems. Whitman is not a front-line medical provider: she did not directly examine or treat Bull and she could not directly prescribe medications or even bottled water to inmates. The fact that the institution complaint examiner consulted Whitman regarding Bull's grievance does suggest that Whitman could have done something to intervene in Bull's medical treatment if she thought it was appropriate to do so. But there is nothing in the record that could lead a reasonable jury to conclude that Whitman was aware of a risk of harm to Bull yet she disregarded it. Whitman reviewed Bull's medical records and concluded that nothing in them suggested that the water was harming Bull, that a provider had authorized bottled water for

8

him, or even that Bull had asked for bottled water but been turned down. And more generally, Whitman had been told that the FLCI water was safe to drink.

Bull points to the complaint examiner's statement that Whitman told her that "Bull's medical conditions are not all related to consuming water at FLCI," and he argues that this implies that some of his conditions were in fact caused by the water. I agree that this statement—taken alone—is ambiguous. But in the context of the entire examiner's report, the only reasonable inference is that the phrase "are not all related" is a typo or mistake. Whitman clearly told the examiner that there was no evidence in the medical record suggesting that his high blood pressure or kidney stones were caused by the water. Because Whitman had no reason to think that the water was harming Bull, she did not violate his Eighth Amendment rights by failing to tell the examiner to take further action to help him.

Bull also suggests that prison staff knew that he suffered from an anxiety disorder, and that they should have known that their actions regarding the contaminants—such as warning inmates with high blood pressure that they were more susceptible to harm but then not providing them with bottled water while staff had bottled water provided or brought in from home—would have exacerbated his anxiety. I understand why an inmate like Bull would feel more anxiety after being warned about problems with the water and seeing staff refusing to drink it. But the only defendant left in this case is Whitman, and Bull does not explain how she was responsible for exacerbating his anxiety by failing to treat it. *See Burks v. Raemisch*, 555 F.3d 592, 594–95 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). As the health services manager, Whitman wasn't responsible for the bottled-water policies at FLCI for prisoners or staff, and she did not directly provide him medical care.

9

Because Bull fails to show that his medical problems were caused by the FLCI water or that Whitman consciously disregarded his medical problems, I will deny Bull's motion for summary judgment, grant Whitman's motion for summary judgment, and dismiss the case.[4]

ORDER

IT IS ORDERED that:

1. Plaintiff Duane Bull's motion for summary judgment, Dkt. 160, is DENIED.

2. Defendant Candace Whitman's motion for summary judgment, Dkt. 164, is GRANTED.

3. The clerk of court is directed to enter judgment accordingly and close this case.

Entered March 13, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

---

[4] Whitman also contends that she is entitled to qualified immunity on Bull's Eighth Amendment claim. Because I am dismissing Bull's claim on the merits, I need not consider Whitman's qualified immunity argument.